## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

| | | |
|---|---|---|
| MELISSA VANPROOYEN, | ) | |
| | ) | No. 14 CV 6755 |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Magistrate Judge Young B. Kim |
| | ) | |
| CAROLYN W. COLVIN, Acting | ) | |
| Commissioner of Social Security, | ) | |
| | ) | August 25, 2016 |
| Defendant. | ) | |

## MEMORANDUM OPINION and ORDER

Melissa Vanprooyen seeks Disability Insurance Benefits ("DIB") and Supplemental Security Income ("SSI") based on her claim that she is unable to work because of a combination of medical problems including seizures, fibromyalgia, short-term memory loss, anxiety, attention deficit hyperactivity disorder ("ADHD") and post-traumatic stress disorder ("PTSD"). After the Commissioner of the Social Security Administration denied her applications, Vanprooyen filed this lawsuit seeking judicial review. *See* 42 U.S.C. § 405(g). Before the court are the parties' cross-motions for summary judgment. For the following reasons, Vanprooyen's motion is denied, the government's is granted, and the Commissioner's final decision is affirmed:

## Background

Vanprooyen filed her DIB and SSI applications in February 2012 claiming a disability onset date of March 15, 2010. (Administrative Record ("A.R.") 200-12.) After her claims were denied initially and upon reconsideration, (id. at 122-23, 150-

51), Vanprooyen sought and was granted a hearing before an administrative law judge ("ALJ"). That hearing took place on April 29, 2013. (Id. at 54-95.) On May 30, 2013, the ALJ issued a decision concluding that Vanprooyen is not disabled and therefore not entitled to DIB or SSI. (Id. at 32.) When the Appeals Council declined review, (id. at 1-6), the ALJ's decision became the final decision of the Commissioner, *see Schomas v. Colvin*, 732 F.3d 702, 707 (7th Cir. 2013). Vanprooyen filed this lawsuit seeking judicial review of the Commissioner's final decision, (R. 1); *see also* 42 U.S.C. § 405(g), and the parties consented to this court's jurisdiction, (R. 8); *see also* 28 U.S.C. § 636(c).

## Facts

In March 2010 Vanprooyen was 27 years old and working as a waitress when she fell down a flight of stairs and suffered a brain injury. In pursuing disability benefits Vanprooyen initially identified her disability onset date as the day of that injury, but when the ALJ pointed out at her hearing that she continued to work as a waitress until October 2011, Vanprooyen amended her onset date to October 1, 2011. (A.R. 94.) At the hearing Vanprooyen presented medical records, her own testimony, and the testimony of her fiancé, James Ribar, in support of her claim that symptoms related to her brain injury, fibromyalgia, anxiety, PTSD, and ADHD prevent her from engaging in full-time work.

## A. Medical Evidence

Vanprooyen's medical records reflect that starting in 2009 she was receiving treatment from internal medicine specialist Dr. Dorothy Jones for headaches and

fibromyalgia.  (A.R. 365, 376, 382.)  At the time she was also seeing a psychiatrist who prescribed medications to treat her anxiety, depression, and ADHD.  (Id. at 516-17.)

On March 15, 2010, Vanprooyen was admitted to the hospital after falling down a flight of stairs and suffering a head injury.  (Id. at 354-55.)  CT scans showed that she had a traumatic hemorrhage and contusion in her brain's left hemisphere.  (Id. at 320-21, 327.)  She also underwent an electroencephalogram to rule out epileptiform activity, which showed results consistent with mild diffuse encephalopathy.  (Id. at 343-44.)  Vanprooyen was discharged six days after her admission with prescriptions for pain and anticonvulsant medications and with instructions to resume activity as tolerated.  (Id. at 354-55.)  She was also given a form signed by a neurosurgeon stating that she was able to return to work.  (Id. at 311.)  At her follow-up appointment a month after her fall, Dr. Nassir Mansour wrote that her general physical exam was normal and that she had made a "very good recovery."  (Id. at 353.)  Dr. Mansour noted that Vanprooyen was "very keen to go back to her job where she works as a waitress" and wrote that there was no reason why she could not return to work.  (Id.)

On April 22, 2010, Vanprooyen was admitted to the hospital again after she experienced a grand mal seizure at home and again in the emergency room.  (Id. at 403, 441.)  Dr. Jones noted that she had been taken off of her seizure medications and that one of her pain medications may have lowered her seizure threshold.  (Id. at 443.)  The day after her hospital admission Vanprooyen had a consultation

regarding her seizure disorder with Dr. Engin Yilmaz. (Id. at 394.) He noted that Vanprooyen had been stabilized but that she would need to be on antiepileptic medications for at least two years. (Id. at 399, 401.) He also noted that Vanprooyen was working at a Chili's restaurant and wrote that he "would not allow her to work more than 8 hours" and that she shouldn't drive, climb heights, or use machines. (Id. at 401.) A few days after her two seizures Dr. Jones prescribed medication for headaches and provided Vanprooyen with a work-release form stating that she could return to work on April 28, 2010, with no restrictions. (Id. at 366, 368.)

Dr. Yilmaz saw Vanprooyen twice more in 2010 and once in January 2011. In May 2010 Dr. Yilmaz observed that Vanprooyen walked with a normal gait, had normal speech, and displayed appropriate attention. (Id. at 397.) In December 2010 he noted that Vanprooyen had stopped taking her anticonvulsant medications because they made her drowsy and now was complaining about increased insomnia and anxiety. (Id. at 395.) Vanprooyen suffered a seizure in his office. (Id.) Dr. Yilmaz wrote that she was not compliant with her medications and that he had a long discussion with her about the importance of antiepileptic compliance. (Id.) Dr. Yilmaz also wrote "I have limited her working hours to six hours per day," and that she should follow up in two months. (Id. at 396.) In January 2011 Vanprooyen reported to Dr. Yilmaz that since she restarted her antiepileptic medication she had not had any lethargy or gait instability. (Id. at 391.)

Vanprooyen was next hospitalized when she gave birth in October 2011. Her physician noted that she had not had a seizure in close to a year but that she was

lucky in that respect because she had gone to a doctor other than Dr. Yilmaz, and the new doctor changed her epilepsy medications. (Id. at 448.) The doctor observed that Vanprooyen had normal coordination and sensation and a normal gait, and noted that she promised to restart her anticonvulsant medications. (Id.)

Eight days after giving birth Vanprooyen went to an emergency room and reported that she had been having pain from the waist down for four days and that she was experiencing low-back pain at a level of seven out of ten on the pain scale. (Id. at 415.) The doctor noted that her pain was likely related to fibromyalgia and that she was asking for pain medication. (Id.at 418.) He observed a normal lower extremity exam with normal range of motion, and noted that upon discharge Vanprooyen was in good condition. (Id. at 49.)

In 2011 Vanprooyen received psychiatric treatment from Dr. Harlan Alexander at a youth services center. Dr. Alexander prescribed Vanprooyen Xanax for her anxiety. (Id. at 513-14.) She reported to Dr. Alexander that she had trouble sleeping, endured headaches, and needed to keep logs to remember to do things. (Id. at 511.) She reported that she had trouble sustaining memories and that only Xanax made her feel good. (Id. at 510.) Throughout this time, Dr. Alexander marked categories on the "mental status" form of his note showing that she was generally functioning in the normal range. (Id. at 509-14.)

In late 2011 Vanprooyen switched to seeing Dr. Paul Carter for her psychiatric issues. From that time through April 2013 Dr. Carter noted that Vanprooyen reported anxiety, insomnia, and a poor attention span but checked

boxes in the mental status portion of the form indicating generally normal responses. (Id. at 506-07, 509, 667-70, 673, 681.) Vanprooyen declined antidepressants but Dr. Carter prescribed her Xanax, Methadone, and Trazodone. (Id. at 506, 673.) In October 2012 Dr. Carter filled out a medical source statement in support of Vanprooyen's disability benefits applications in which he wrote that her "ability to maintain focus, mental organization and memory is impaired." (Id. at 641.) Dr. Carter rated her abilities as fair or poor in every sub-category listed for understanding, remembering, and carrying out instructions, wrote that she needs assistance for organization and transportation, and stated that she has difficulty comprehending written language. (Id. at 642.) In response to the question, "what medical/clinical findings support this assessment," Dr. Carter answered, "Patient's report." (Id.) He also wrote a separate note stating that her traumatic brain injury had impacted her ability to comprehend written language and her short- and long-term memory, but that some of her symptoms respond to medication. (Id. at 643.)

In 2012 Vanprooyen also underwent a consultative psychological examination with Dr. Michael Stone. (Id. at 520.) Dr. Stone reported that Vanprooyen is a good informant who could remember a good deal of her past history and who did not exhibit the kinds of mood lability or manic symptoms typically associated with bipolar disorder. (Id. at 520-21.) Dr. Stone noted, however, that Vanprooyen exhibited problems maintaining a consistent level of attention and concentration throughout the examination and that her mother helps her with travel and money management. (Id.) Dr. Stone found that she has no significant impairment in her

ability to perform calculations or in her general fund of knowledge, but diagnosed her as having generalized anxiety disorder with panic, ADHD, PTSD, short-term memory loss, seizures, brain damage, and fibromyalgia. (Id. at 523.) He opined that she would be unable to manage benefits on her own. (Id.)

Shortly after the consultative examination, two state consulting physicians filled out disability determination explanations in connection with Vanprooyen's initial DIB and SSI applications and her request for reconsideration after the initial denial. (Id. at 96-121, 124-49.) The consulting physicians opined that Vanprooyen has only mild difficulties in activities of daily living and social functioning but that she has moderate limitations when it comes to concentration, persistence, or pace. (Id. at 101, 130.) They concluded that her subjective symptoms were "somewhat disproportionate" to the objective medical findings. (Id.) They opined that her impairments do not meet or equal any listings, (id. at 102, 131), and that despite her moderate limitations in her ability to understand and remember detailed instructions, to carry out detailed instructions, to maintain attention and concentration for extended periods, and to respond appropriately to changes in the work setting, (id. at 105-06, 132-33), Vanprooyen can perform light work and has sufficient mental capacity to perform "operations of a routine and simple nature on a sustained basis," (id. at 101, 131). On reconsideration the consulting physicians explained that Vanprooyen's moderate concentration limitations do not prevent her from completing routine, repetitive tasks. (Id. at 146.)

As for her fibromyalgia symptoms, Vanprooyen underwent an initial fibromyalgia evaluation with Dr. Saima Chohan in February 2012. Vanprooyen reported that pain had increased her anxiety and depression and that her symptoms were intermittent but worse at the end of the day. (Id. at 556.) Dr. Chohan noted that Vanprooyen had a normal range of musculoskeletal motion but that she was diffusely tender at 18/18 tender points and at multiple control points. (Id. at 557.) Dr. Chohan assessed Vanprooyen as having diffuse myalgias and arthralgia and recommended working with doctors to treat what she characterized as "likely secondary fibromyalgia." (Id. at 557-58.) The following month Vanprooyen saw two rheumatologists who observed joint swelling and stiffness, multiple muscle tender points, and slight tenderness in her wrists, knees, and ankles. (Id. at 552-53.) They recommended aqua therapy and orthotic supports. (Id. at 555.)

In November 2012 Dr. Jones completed a medical source statement with respect to Vanprooyen's fibromyalgia. Dr. Jones reported that she had seen Vanprooyen once or twice a year since 2005 and that she has multiple tender points, nonrestorative sleep, chronic fatigue, severe headaches, numbness, tingling, anxiety, and pain at a level of seven out of ten every day. (Id. at 647-48.) Dr. Jones wrote that Vanprooyen can sit for only 20 minutes before needing to stand and that she needs jobs that will allow her to shift positions at will. (Id. at 648.) She further opined that Vanprooyen would need to be able to walk for 10 minutes every hour and would need four unscheduled breaks of 10-15 minutes each day. (Id. at 649.)

She also wrote that Vanprooyen is likely to be off task for 25% or more of the work day, that she would be absent more than four days a month, and that she is incapable of handling even low-stress work. (Id. at 650.) Dr. Jones also commented that Vanprooyen had been living with those limitations since 2005. (Id.)

## B. Vanprooyen's and Ribar's Hearing Testimony

At her April 2013 hearing before the ALJ, Vanprooyen testified that she lives with her fiancé and is the main caretaker for their two year-old daughter. (Id. at 62-63.) She testified that her mother and fiancé help with child care and remind her to check a written schedule she keeps telling her when to feed her daughter. (Id. at 63-64.) Vanprooyen explained that at the time of her 2010 fall, she had four years of college and an associate's degree, and that she took her finals for her bachelor's degree after her fall but she does not know whether she passed. (Id. at 61-62.) After her injury she went back to work waiting tables at a Chili's restaurant three days a week, but she said that she needed help carrying trays and cleaning under her booths. (Id. at 66-68.) She said that she had trouble remembering her orders and started having to write them all down, and that she eventually quit working because "it wasn't worth my coworkers to have to carry my weight." (Id. at 66, 70.)

In describing her impairments, Vanprooyen testified that she has migraines about three times a week for a couple of hours at a time, and that when they flare she has to be in the dark until they pass. (Id. at 70-71, 78.) She testified that her migraines sometimes improve when she takes Excedrin. (Id. at 78.) She also

described short-term memory problems and said that although those struggles do not impact her ability to care for her daughter, she often has trouble remembering the details of novels that she reads.  (Id. at 70, 76-77.)  Vanprooyen testified that she had not had a seizure in over a year and that she planned to stay on seizure medications indefinitely.  (Id. at 72-73.)  She said that she has fibromyalgia pain in her back and knees for which she takes aspirin and ibuprofen.  (Id. at 73-74.)  Vanprooyen said she does not notice any side effects from any of her medications. (Id. at 78.)

Vanprooyen's fiancé, James Ribar, also testified at the hearing and described Vanprooyen's struggles with memory and migraines.  Ribar testified that Vanprooyen's memory and coordination are not 100% and that he has to write down her appointments and remind her to take her medications.  (Id. at 84.)  He said that sometimes Vanprooyen is unable to remember having watched a tv episode.  (Id. at 85.)  Ribar also testified that Vanprooyen has headaches five times a week for a few hours or longer and that she runs out of prescribed headache medications quickly and then has to use over-the-counter pain relief.  (Id. at 86-87.)

C.     **The Vocational Expert's Testimony**

After describing Vanprooyen's past relevant work for the ALJ, the vocational expert ("VE") answered questions the ALJ posed regarding the kinds of jobs a person with certain hypothetical limitations could perform.  The ALJ proposed a hypothetical person limited to light work with occasional balancing, stooping, kneeling, crouching, crawling, and climbing ramps and stairs, who could never

climb ladders, ropes, or scaffolds, and who could never work around hazards or operate motor vehicles. The person could not be exposed to loud noise, could engage in only occasional overhead reaching, and could perform only simple, routine tasks on an assisting basis that could be learned on short demonstration. The hypothetical individual would also be limited to goal-oriented work with no fast-paced production requirements. (Id. at 91.) The VE testified that such a person could perform a number of jobs that exist in significant numbers in the national economy, including counter clerk, cashier, and shipping and routing clerk. (Id. at 91-92.) The VE also testified that the inability to sustain a normal work routine without supervision or being off-pace or off-task for 25% of the day would preclude competitive work. (Id. at 92-93.) The VE further testified that work would be precluded for anyone who would be absent four days a month or is unable to sit, stand, or walk for a total of less than four hours in an eight-hour day. (Id. at 92.)

**D.    The ALJ's Decision**

On May 30, 2013, the ALJ issued a decision denying Vanprooyen's applications for DIB and SSI. (A.R. 32.) In engaging in the required five-step process for evaluating disability claims, *see* 20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4), the ALJ found at step one that Vanprooyen had not engaged in substantial gainful activity since her amended disability onset date of October 1, 2011. (Id. at 21.) At step two the ALJ determined that Vanprooyen has severe impairments including obesity, seizures, status post history of traumatic brain injury in March 2010, fibromyalgia, headaches, generalized anxiety disorder with

panic, PTSD, bipolar disorder, ADHD, and a history of polysubstance abuse in reported remission. (Id.) At step three the ALJ concluded that none of Vanprooyen's impairments meet or equal a listed impairment. (Id. at 22.) In considering the severity of Vanprooyen's mental impairments the ALJ determined that she has only mild restrictions in activities of daily living and social functioning, but that she has moderate difficulties in concentration, persistence, or pace. (Id. at 22-23.)

Before turning to step four, the ALJ determined that Vanprooyen has the residual functional capacity ("RFC") for light work except that she can only occasionally reach overhead, balance, stoop, kneel, crouch, crawl, and climb ramps or stairs and never climb ladders, ropes, or scaffolds, work around hazards, or operate a motor vehicle. (Id. at 23.) The ALJ further determined that Vanprooyen is limited from working around loud noises and that she can only perform simple, routine tasks that are goal-oriented on a sustained basis, that can be learned on short demonstration, and that do not involve fast production-paced work. (Id.) In explaining the RFC the ALJ said that she gave substantial weight to the consulting physicians' opinions and great weight to the notes from a treating physician releasing Vanprooyen to work. (Id. at 29-30.) She also wrote that Vanprooyen's description of her symptoms was not fully credible because it was out of proportion to her daily activities and medical records, and because the timing of her onset date suggests that she stopped working to care for her child. (Id. at 28.) Turning to step four the ALJ concluded that Vanprooyen is not capable of performing any of her

past relevant work, but at step five the ALJ adopted the VE's testimony that a person with the assigned RFC could work as a counter clerk, cashier, or shipping and routing clerk.  (Id. at 30-31.)  Accordingly, the ALJ concluded that Vanprooyen is not disabled.  (Id. at 32.)

## Analysis

In her motion for summary judgment Vanprooyen argues that the ALJ's decision must be reversed because, according to her, the ALJ engaged in an improper credibility assessment and misweighed and mischaracterized evidence when evaluating her RFC.  This court's review of the ALJ's decision is "extremely limited," asking only whether the decision is free of legal error and supported by substantial evidence, meaning "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Stepp v. Colvin*, 795 F.3d 711, 718 (7th Cir. 2015) (internal quotations and citations omitted).  Because the court's role is neither to reweigh the evidence nor to substitute its own judgment for the ALJ's, if the ALJ's decision is adequately supported and explained it must be upheld even where "reasonable minds can differ over whether the applicant is disabled." *Shideler v. Astrue*, 688 F.3d 306, 310 (7th Cir. 2012).  In order to adequately support the decision, the ALJ must build "an accurate and logical bridge from the evidence to her conclusion that the claimant is not disabled." *Simila v. Astrue*, 573 F.3d 503, 513 (7th Cir. 2009) (internal quotation omitted).  Here, the ALJ built the requisite logical bridge in thoroughly explaining why she discounted Vanprooyen's testimony

and some of the treating physicians' opinions and in describing how the assigned RFC limitations accommodate her credible restrictions.

## A. Symptom Evaluation

Vanprooyen first argues that the ALJ failed to comply with Social Security Ruling ("SSR") 96-7p and therefore erred in assessing the credibility of her description of her symptoms and in dealing with Ribar's testimony.[1] (R. 15, Pl.'s Mem. at 7.) A claimant's burden in challenging an ALJ's assessment of her testimony regarding her symptoms is particularly high because the court will only overturn such an assessment if it is "patently wrong." *See Shideler*, 688 F.3d at 310-11. The court's job is not to "nit-pick" the ALJ's evaluation of the claimant's statements, *see Castile v. Astrue*, 617 F.3d 923, 929 (7th Cir. 2010), but that is exactly what Vanprooyen requests. For example, Vanprooyen argues that the ALJ "misrepresented" her testimony by acknowledging that she has to check a written schedule every day but omitting that she needs to be reminded to check the schedule. The ALJ is not required to discuss every detail of the claimant's testimony, and here the ALJ acknowledged that Vanprooyen's concentration issues require her to use written reminders. Faulting the ALJ for omitting her testimony

---

[1] The Social Security Administration recently issued an SSR updating its guidance about evaluating symptoms in disability claims. *See* SSR 16-3p, 2016 WL 1119029 (effective March 28, 2016). The new SSR 16-3p supersedes SSR 96-7p, eliminating the term "credibility" from the Administration's sub-regulatory policies in favor of a focus on symptom evaluation. *Id.* at *1. "The change in wording is meant to clarify that [ALJs] aren't in the business of impeaching a claimant's character," but they "will continue to assess the credibility of pain *assertions* by applicants." *Cole v. Colvin*, __F.3d__, 2016 WL 3997246, at *1 (7th Cir. July 26, 2016) (emphasis in original).

that she needed an oral reminder to check the written reminder amounts to the kind of nit-picking the standard of review precludes. *See Castile*, 617 F.3d at 929.

Vanprooyen also argues that the ALJ overemphasized her daily activities in evaluating her symptoms. It is true that the Seventh Circuit has repeatedly warned ALJs against equating an ability to perform minimal daily activities to a capacity for full-time work, *see, e.g., Hughes v. Astrue*, 705 F.3d 276, 278 (7th Cir. 2013), but the regulations direct ALJs to consider a claimant's daily activities as one factor among many when weighing the severity of reported symptoms, *see Pepper v. Colvin*, 712 F.3d 351, 369 (7th Cir. 2013). Here, among the factors the ALJ considered in assessing Vanprooyen's reported symptoms were her ability to care for a young child while her fiancé worked and her abilities to shop, perform household chores, and visit with friends and family. (A.R. 28.) Vanprooyen argues that the ALJ should have discussed how long her chores take instead of translating them into an ability to work full time. (R. 15, Pl.'s Mem. at 9.) But nothing in the ALJ's decision suggests that she concluded that Vanprooyen's daily activities alone demonstrate a capacity for full-time work. Rather, the ALJ properly discussed her daily activities as one factor among many—including a lack of corroboration in the objective medical record, her work as a waitress, inconsistencies in her self-reports, and improvement with medication—in assessing the severity of Vanprooyen's symptoms.[2] (A.R. 28-29.)

---

[2] Vanprooyen's argument that the ALJ discredited her testimony based on "objective medical evidence alone" is belied by the ALJ's discussion of all of these factors, showing that the ALJ permissibly accounted for the mismatch between her

Vanprooyen next argues that the ALJ erred in factoring in her work as a waitress up until the birth of her child because, according to Vanprooyen, the ALJ erroneously labeled that work as substantial gainful activity without considering the special assistance she received from co-workers on the job. To be clear, at step one the ALJ found that Vanprooyen's waitressing work did not amount to substantial gainful activity. (A.R. 21.) So her use of that term in the RFC discussion is perhaps unnecessarily obscuring, but when read in the context of the overall discussion, it is clear that the ALJ was aware of and factored in Vanprooyen's limited hours and the on-the-job assistance she received. (Id. at 28.) And in any event, the regulations state only that receiving special assistance on the job "may" lead to a finding that the claimant is unable to perform substantial gainful activity, *see* 20 C.F.R. § 404.1573(c), not that an ALJ is required to find disabled any claimant who received such assistance. Relatedly, Vanprooyen faults the ALJ for taking into account that her work end-date coincided with childbirth, arguing that the ALJ should have considered a link between childbirth and an exacerbation of her fibromyalgia. But Vanprooyen did not testify that she stopped working because of a fibromyalgia exacerbation, and as the ALJ pointed out, in a self-report Vanprooyen herself wrote that she stopped working when she had her baby. The ALJ was entitled to view that timing as evidence that Vanprooyen's decision to stop working was related at least in part to the birth of her child.

---

testimony and the objective records as only one factor among several. *See Pierce v. Colvin*, 739 F.3d 1046, 1049-50 (7th Cir. 2014) (noting that even though ALJ may not discount credibility based solely on a lack of corroborating medical evidence, that absence is a relevant factor in credibility analysis).

Vanprooyen also argues that the case should be remanded because the ALJ did not say specifically what weight she assigned to Ribar's testimony, and as such, she "overlooked a whole line of evidence." (R. 15, Pl.'s Mem. at 7.) But the ALJ did not "overlook" Ribar's testimony. She recounted Ribar's testimony in detail, including his description of Vanprooyen's memory issues, migraines, and seizures. (A.R. 25.) Although the ALJ did not ascribe a specific weight to his testimony, she considered his testimony in the course of evaluating Vanprooyen's RFC. The ALJ did not reject or ignore Ribar's testimony because it was corroborative of Vanprooyen's, *compare Barnett v. Barnhart*, 381 F.3d 664, 670 (7th Cir. 2004), and Vanprooyen has not explained what aspect of Ribar's testimony she thinks the ALJ should have given more weight when evaluating her RFC. Moreover, even the cases Vanprooyen cites suggest that an ALJ's failure to assign a specific weight to a lay witness's testimony renders the overall credibility analysis patently wrong only if the ALJ failed to analyze other evidence relevant to that assessment. *See, e.g., Carlson v. Shalala*, 999 F.2d 180, 181 (7th Cir. 1993) (affirming where ALJ failed to discuss claimant's wife's "essentially redundant" testimony); *Young v. Sec. of HHS*, 957 F.2d 386, 392 (7th Cir. 1992) (reversing where Appeals Council failed to consider claimant's testimony, three doctors' reports, and affidavits by claimant's former wife and relatives); *Look v. Heckler*, 775 F.3d 192, 195 (7th Cir. 1985) (reversing where "the ALJ failed to make an express credibility finding concerning any of the evidence supporting" the claimant's position). In contrast to the cited cases, the ALJ here expressly discussed the weight she gave to Vanprooyen's

testimony and the doctors' opinions, and discussed at length the substance of Ribar's testimony, which was essentially the same as Vanprooyen's. That is sufficient to satisfy the court that the ALJ did not overlook an entire line of evidence in weighing Vanprooyen's symptoms. *See Books v. Chater*, 91 F.3d 972, 980 (7th Cir. 1996) (finding no reversible error in ALJ's failure to even discuss corroborative testimony of claimant's brother). For these reasons, Vanprooyen has not shown that a remand is warranted based on the ALJ's handling of Ribar's testimony.

## B.    The RFC Assessment

Vanprooyen's challenge to the ALJ's RFC assessment rests primarily on her contention that the ALJ improperly weighed the medical opinions of her treating physicians, Drs. Carter, Yilmaz, and Jones. The governing regulations require an ALJ to give "controlling weight" to a treating physician's opinion if it is "well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence." 20 C.F.R. § 404.1527(c)(2); *see also Punzio v. Astrue*, 630 F.3d 704, 710 (7th Cir. 2011). If the opinion does not meet those criteria, the ALJ must explain what weight she assigns the opinion after analyzing factors including the length and nature of the treating relationship, the frequency of examination, the supportability and consistency of the opinion, and the doctor's specialization. 20 C.F.R. § 404.1527(c)(2)-(6). This court will "uphold all but the most patently erroneous reasons for discounting a treating physician's assessment." *Stepp*, 795 F.3d at 718 (internal quotation and citation omitted).

Vanprooyen first argues that the ALJ erred in assigning little weight to Dr. Carter's opinion that she has fair or poor mental abilities. (R. 15, Pl.'s Mem. at 11.) The ALJ explained that she found Dr. Carter's opinion to be inconsistent with treatment records demonstrating generally normal findings on mental status examinations and improvements with medications. (A.R. 30.) She also found the opinion to be inconsistent with Vanprooyen's testimony regarding her waitressing duties and her ability to be the caregiver for a small child. (Id.) Vanprooyen argues that these are not "good reasons" because she says the opinion was consistent with the consulting examiner's findings. But the ALJ fully addressed the consulting examiner's findings regarding her depression, anxiety, and concentration issues, and Vanprooyen does not explain why the consulting examiner's findings support limitations to the extent set forth in Dr. Carter's opinion.[3] The ALJ also wrote that Vanprooyen's attorney had argued that Dr. Carter's opinion supported a finding that she could not work without special supervision, but rejected that argument because Vanprooyen had not had a job coach or special supervision at Chili's. (Id.) Vanprooyen argues that this finding was erroneous because the consulting examiner found that she could not remember three objects after five minutes. But

_____

[3] Vanprooyen again tries to represent as a "mischaracterization" what is actually a harmless omission in the ALJ's discussion of the consulting examiner's findings, acknowledging that the ALJ discussed her ability to remember and repeat four digits forward and three backwards but arguing she misrepresented these findings by not clarifying that six digits were presented. (R. 15, Pl.'s Mem. at 10-11.) Again, this is the kind of hypercritical nit-picking that the standard of review precludes. The ALJ was not required to discuss every aspect of the consultative examiner's findings in order to build a logical bridge to her conclusion. *See Pepper*, 712 F.3d at 362; *Simila*, 573 F.3d at 516.

that does not counter the reality that Vanprooyen worked for months after the consulting examination in a role as a waitress, without a job coach, and with assistance that she did not say amounted to special supervision. Most importantly, the ALJ explained that she discounted Dr. Carter's opinion because he wrote on the RFC form that his opinion is based on Vanprooyen's reports. An ALJ is entitled to discount a physician's opinion where it is based solely on a claimant's subjective reports, *see Filus v. Astrue*, 649 F.3d 863, 868 (7th Cir. 2012); *Ketelboeter v. Astrue*, 550 F.3d 620, 625 (2008); *Dixon v. Massanari*, 270 F.3d 1171, 1178 (7th Cir. 2001), and here the record supports the ALJ's conclusion that subjective reports were the main source of Dr. Carter's opinion.[4] Dr. Carter said so himself. (A.R. 641.)

Turning to the ALJ's treatment of Dr. Yilmaz's opinion, Vanprooyen argues that even though she gave great weight to the bulk of Dr. Yilmaz's opinion, she erred in discounting his opinion that she should not work for more than six hours a day after finding that he made that statement when Vanprooyen's seizure disorder flared after she discontinued her medication. (A.R. 30.) The ALJ explained that the six-hour limitation was not expected to last twelve months because when

---

[4] In the recent *Cole* decision, the Seventh Circuit criticized an ALJ for giving no weight to a treating physician's opinion regarding the claimant's pain because it was based on the claimant's report. 2016 WL 3997246, at *4. But there the Court noted that the physician had performed tests showing abnormal results and reiterated that a claimant's pain description should not be discounted solely because it is unsupported by objective evidence. *Id.* Here, by contrast, the ALJ was dealing with an opinion regarding the severity of mental-health symptoms rather than pain, where the treating source specifically wrote that he assigned limitations based on Vanprooyen's report. The *Cole* decision does not suggest that an ALJ engages in reversible error by including among several factors detracting from a doctor's opinion the fact that it rests only on the claimant's subjective descriptions.

Vanprooyen was taking her medication consistently, her seizure disorder was under control. Indeed, both Vanprooyen and Ribar testified that at the time of the hearing she had not experienced a seizure for more than a year. (A.R. 72, 87.) Vanprooyen argues that the ALJ's reasoning was insufficient because she overlooked Vanprooyen's explanation that she discontinued her seizure medications temporarily because they made her drowsy. But she gave that explanation in December 2010 when Dr. Yilmaz imposed the six-hour work limitation. Vanprooyen cites no evidence supporting her assertion that after her medications were adjusted and she stopped having seizures, she continued to suffer from daytime drowsiness. The most recent complaint of daytime drowsiness she cites reaches back to January 2011, almost two and a half years before the ALJ's decision. Plus, at her hearing, Vanprooyen testified that she did not notice any side effects from her medications. (A.R. 78.) Accordingly, she has not shown that the ALJ erred either in disregarding Dr. Yilmaz's six-hour work limit or in failing to discuss her daytime drowsiness in greater detail.

Finally, Vanprooyen argues that the ALJ erred in evaluating her fibromyalgia, both in giving little weight to Dr. Jones's opinion that her pain would cause her to be off-task for 25% of the work day and in assessing the objective records regarding her trigger-point tenderness pursuant to SSR 12-2p. The ALJ offered a number of well-supported reasons to explain why she thought Dr. Jones's medical source statement deserves little weight. Most importantly, the ALJ explained that Dr. Jones's opinion is inconsistent with her own treatment notes.

(A.R. 30.)  For example, the ALJ pointed out that although Dr. Jones wrote that her description of Vanprooyen's "symptoms and limitations" stemmed back to 2005, the fact that she released Vanprooyen to work in 2010 was inconsistent with symptoms that allow for less than sedentary work.  (Id.)  Vanprooyen argues that the ALJ "concocted" the juxtaposition between her condition in 2005 and her 2010 work release, (R. 15, Pl.'s Mem. at 15), but it was Dr. Jones who wrote that her opinion regarding Vanprooyen's "symptoms and limitations" has applied since 2005, (A.R. 650).  Moreover, the ALJ observed that although in her medical source statement Dr. Jones wrote that Vanprooyen has daily pain at the level of seven out of ten, in treatment notes dated that same year rheumatologists wrote that Vanprooyen's daily pain averaged only four or five out of ten.  (Id. at 30, 552, 648.)  The ALJ was entitled to find that these inconsistencies weighed against fully crediting Dr. Jones's opinion.  *See* 20 C.F.R. § 404.1527(c)(4).

The ALJ also wrote that her decision to discount Dr. Jones's opinion rested in part on the fact that Dr. Jones only saw Vanprooyen once or twice a year, another permissible factor for consideration.  *See* 20 C.F.R. § 404.1527(c)(2)(i).  The ALJ further noted that Dr. Jones's opinion "is excessive in light of the medical evidence of record and [Vanprooyen's] activities of daily living."  (A.R. 30.)  That is borne out in the record.  For example, Dr. Jones opined that Vanprooyen can sit for less than 20 minutes at a time and for less than 2 hours total in an 8-hour day.  (Id. at 648.)  But in her own self-report Vanprooyen indicated that she has no restrictions in sitting, and at her hearing she did not describe any difficulties with sitting.  (Id. at

274.)  For these reasons, the ALJ properly supported her decision to discount Dr. Jones's opinion.

Vanprooyen asserts that the "ALJ failed to comply with SSR 12-2p" in analyzing her fibromyalgia, but she has not developed any argument to explain what she means.  (R. 15, Pl.'s Mem. at 14.)  Instead she points out that Dr. Chohan noted in February 2012 that she was "[d]iffusely tender at 18/18 points and multiple control points," (A.R. 557), and asserts that this supports Dr. Jones's opinion that her fibromyalgia would cause her to be off-task 25% of the time and to miss more than four days of work per month, (R. 15, Pl.'s Mem. at 14).  SSR 12-2p provides guidance regarding how an ALJ should evaluate evidence of fibromyalgia, noting that there are 18 tender point sites on each side of the body and that tenderness at least 11 of those points are among the criteria supporting a fibromyalgia diagnosis.  SSR 12-2p, 2012 WL 3104869, at *3 (July 25, 2012).  The ALJ acknowledged the evidence that Vanprooyen was diffusely tender at 18/18 points and other evidence supporting her fibromyalgia diagnosis.  (A.R. 26.)  Because Vanprooyen has not explained what aspect of SSR 12-2p she thinks the ALJ neglected, the court sees no basis for reversal stemming from the ALJ's treatment of her fibromyalgia.

## Conclusion

For the foregoing reasons, Vanprooyen's motion for summary judgment is denied, the government's is granted, and the Commissioner's final decision is affirmed.

**ENTER:**

_____
**Young B. Kim**
**United States Magistrate Judge**